ROYAL CANNING CORPORATION et al.

v. INDUSTRIAL COMMISSION et al.

No. 6383. Decided January 27, 1942. (121 P. 2d 406.)

See 28 R. C. L., 326 (8 Perm. Supp. 6250.) ; 71 Corp. Jur., Workmen's Compensation Acts, sec. 522.

*Shirley P. Jones,* of Salt Lake City, for plaintiffs.

*Grover A. Giles,* Atty. Gen., *Zar E. Hayes,* Deputy Atty. Gen., and *E. LeRoy Shields, LeGrande L. Belnap,* and *A. H. Hougaard,* all of Salt Lake City, for defendants.

LARSON, Justice.

Certiorari, to review an award made by the Industrial Commission against plaintiffs and in favor of defendant, Dorothy Marie Hughes, hereinafter called the applicant. The plaintiff, Royal Canning Company, operating a canning factory at Ogden, Utah, was the employer and will hereinafter be referred to as the Canning Company. Plaintiff, Continental Casualty Company, was the insurer and will hereinafter be referred to as such. Applicant was employed by the Canning Company from July 3 to July 9, 1940. She did not work on the fifth. She spent part of the time pitting apricots, paid for as piecework, but most of the time was engaged in sorting cherries, at about 30 cents per hour. The time she put in varied from three and one-half to ten hours per day, depending upon the amount of fruit available. The cherries came down a chute and moved along a belt where the sorting was done. On July 9, the guards were removed from one side of the belt for repairs. That morning applicant was put to work on the guarded side of the belt, but later she moved to the unguarded side. While she was loosening cherries stuck in the chute her dress caught in a shaft. When she was trying to free her dress her hands were drawn into the shaft and injured. Here we are concerned only with the injuries to the right hand. Her thumb was injured, necessitating amputation just below the proximal joint. We refer back now to the time of employment for some facts not relating to the injury, but which had a material bearing on the award of the commission. Section 14-6-5, R. S. U. 1933, as amended by Session Laws of Utah 1933, c. 11, p. 17, requires an employment certificate before a minor may be employed in such work. The Division of Unemployment of the Industrial Commission requested the Canning Company to secure its employees through that de-

partment. Pursuant to such request, it asked the unemployment division to send some employees to work in the cherries and apricots. The division sent down a number of employees, among them several minors including the applicant, but did not secure the employment certificates. Such certificate must be issued by the school superintendent, but such officer did not keep his office open for issuance of the certificates as required. The Canning Company allowed the minors to go to work without the certificates in the meantime trying each day to procure them. Before they were obtained applicant was injured, and under the provisions of Section 14-6-27 of Chapter 11, Session Laws of Utah 1933, the commission doubled the compensation otherwise awarded applicant. We shall refer to these matters later.

The award is assailed on the following grounds: (1) The commission used the wrong, and illegal, basis for determining the weekly wage of applicant; (2) The commission used a wrong or illegal method in determining the nature and extent of applicant's injuries, and therefore the length of time compensation was to be paid, and so made the award too large; (3) The commission erred in doubling the amount of the award. We note them in order.

1. Compensation shall be computed upon the basis of the average weekly wage of the applicant. Section 42-1-70, R. S. U. 1933. Applicant worked only six days when she was injured, and was paid on an hourly basis, thirty cents per hour. Her total time was forty-three hours, varying from three and one-half to ten hours per day, or an average of seven and one-sixth hours per day. Her total earnings were $12.90. The days they worked, and the hours each day depended upon the amount of fruit available. It appears from the record that during the cherry and apricot season the cannery regularly operated seven days per week. The average weekly wage at the cannery through two weeks of cherry canning was $15.06 and the average time was 7-1/7 hours per day, time varying from 3½ to 10 hours per day. The statute, Section 42-1-70, reads:

"The average weekly wage shall be determined as follows:   *   *   *
(d)   If the wage is on an hourly basis, multiply the pay per hour by the number of hours employment regularly operates, or, if operation is not regular, use eight hours as a day."

Since there is no dispute that the operation here was not regular, a day consists of 8 hours at 30 cents per hour, or $2.40 per day. The weekly wage computed under subdivision 4 of Section 42-1-70, R. S. U. 1933 as amended by Laws of Utah 1937, c. 41, would give a weekly wage of $15.32 which is more than any of the girls engaged in the same work as applicant actually made in a week.

The commission did not make a finding as to what applicant's weekly wage was, but found it as such as to entitle her to compensation at the rate of $8.31 per week which would be a weekly wage of $13.85. Plaintiffs therefore are right in asserting the commission erred in computing the weekly wage and therefore in determining the weekly compensation. Instead of the $8.31 allowed by the commission, it should have been $9.19.

After the commission fixed appellant's compensation at $8.31 per week, which would be a weekly wage of $13.85, it made an order fixing her compensation for permanent partial disability at $16 per week. Such compensation could only be awarded upon a weekly wage of $26 or $27 per week. Complaint is made of this order as being contrary to law. We have shown above what the weekly wage was as fixed by the statute, to wit: $15.32. The commission found that applicant was of such age and experience that her wages would naturally tend to increase, but made no finding as to the amount it might be expected to increase, and then fixed her compensation at $16 per week.

The statute, Section 42-1-71, R. S. U. 1933, provides:

"If it is established that the injured employee was of such age and experience when injured that under natural conditions his wages would be expected to increase, that fact may be considered in arriving at his average weekly wage."

Is there any evidence in the record to support a finding or conclusion that under natural conditions applicant's earning power would tend to increase to $26 or $27 per week? We search the record in vain for any such evidence. The record discloses that none of the girls or women engaged in the work earned more than $31.55 in twelve days, and one girl, apparently referred to as extra good, received $33 for a two-week period in apricots, the highest paid, as far as the record shows. The record contains a statement in general language that some girls increase their earning capacity when on piece work (pitting apricots) with experience while many of them do not increase. The girl who earned $33.06 in two weeks spent considerable time on apricots. All cherry work was on a flat hour rate of 30 cents per hour. We can find no evidence to support a finding or conclusion of $26 or $27 per week possible future earning capacity on the part of the applicant. The award of compensation of $16 per week therefore must be held to rest upon mere conjecture or surmise. This court has held such cannot be sustained. *Continental Casualty Company* v. *Industrial Commission*, 75 Utah 220, 284 P. 313; *Aetna Life Ins. Co.* v. *Industrial Commission*, 64 Utah 415, 231 P. 442; *Case of Gagnon*, 228 Mass. 334, 117 N. E. 321, 21 A. L. R. 1528; *Western Pacific R. Co.* v. *Industrial Accident Commission*, 180 Cal. 416, 181 P. 787.

2. The only injury sustained by applicant as far as this proceeding is concerned was that resulting from the injury to the right thumb. It became necessary to amputate the thumb 1/6 of an inch below the proximal joint, being substantially the loss of the thumb. The employer and insurer contend that the only compensable loss was a thumb, the compensation time for which is fixed by the statute at thirty weeks. The commission found that in addition to the loss of the thumb there was a 75 per cent loss of function at the wrist due to the loss of the thumb, and awarded compensation for 112½ weeks. The statute,

Section 42-1-62, Chapter 41, Laws of Utah 1937, as far as material here reads:

"In the case of the following injuries the compensation shall be 60 per cent of the average weekly wages * * * for the periods stated against such injuries respectively, * * * to wit:

"One thumb and the metacarpal bone thereof * * * 60 weeks

"One thumb at the proximal joint * * * 30 weeks

\* \* \*

"In the above cases permanent and complete loss of use shall be deemed equivalent to loss of the member or part thereof.

\* \* \*

"For any other disfigurement or loss of bodily function not otherwise provided for herein, such period of compensation as the commission shall deem equitable and in proportion to compensation in other cases, not exceeding two hundred weeks."

The question is as to whether the commission's award of 82½ weeks additional compensation for a loss of bodily function, not otherwise provided for in the section quoted, finds support in the evidence. We shall examine it.

This part of the award is based upon the testimony of Doctors N. Frederick Hicken and E. J. Capener, two members of a medical advisory board of four members who examined applicant at the request of the commission. These two doctors filed a report in which they expressed the opinion that applicant had sustained a loss of function of 75 per cent at the wrist. Upon the hearing and examination of the doctors before the commission, Dr. Hicken testified: There had been an amputation of the right thumb just below the proximal joint; that there was a large amount of scar tissue underlying the incision from amputation that interfered with the function of the metacarpal bone; that applicant had free use of the second, third, and fourth fingers, and grasped things well. From a functional standpoint the thumb plays a very important part in all grasping and manipulative movements in which the hand is used. Due to the scar tissue involving the metacarpal bone to which the thumb is attached it apparently interferes with the func-

tion of that bone, so one cannot say that the disability is limited to the joint between the thumb and metacarpal bone, but extends above that joint. This results in a limitation in the movement of the metacarpal bone to which the thumb is attached; it does not freely move down below the other metacarpal bones, so it does not make a cushion or contact with the next three fingers when the hand grasps or is clenched. The metacarpal bone of the thumb does not rotate freely because the tendons are attached to the bone for some distance above the proximal joint. The amputation of the thumb at the proximal joint disturbs the tendons above. It does not interfere with the movements of the wrist, but prevents a good grasp with the hand because the metacarpal bone extending to the thumb does not rotate freely. If she had completely lost the metacarpal bone the disability would be 95 per cent instead of the 75 per cent now estimated.

Doctor Capener testified that in general he agreed with Doctor Hicken; that due to the scar tissue, extending up $1\frac{7}{8}$ inches from the end of the stump or about half way up the metacarpal bone, it makes a point of lowered resistance to any subsequent injury, and that is in his judgment just reason for the estimate of loss of function at the wrist; the absence of the tendons of the thumb would not interfere with the normal function of the wrist. "So far as your wrist is concerned, your wrist motion is all right." The tendons have not been enlarged. The scar tissue runs about half way down the metacarpal bone; that is the ground for disability. The scar tissue must be taken into consideration because in the future, things may happen to it, from other injuries.

Doctor Martin Lindem was called and asked by Commissioner Jugler what was the percentage of *loss of use of the hand* caused by the amputation of a thumb. The applicant was then called by Commissioner Jugler and testified that it was awkward to hold a knife or sew without her right thumb since she was right-handed. It is evident therefrom that the commission was determining the loss in uses of

the hand due to the loss of the thumb. It is also clear that the only loss of function or use to which there is even an iota of evidence is the interference with the uses of the hand due first, to the loss of the thumb; and second, to the impaired movement of the first metacarpal bone (the metacarpal bone to the thumb) by its impaired rotary motion in grasping or clinching the hand. The evidence is positive and conclusive, with none to the contrary, that such impairment is not as great as it would have been had she lost the metacarpal bone.

Does this situation then present a case of "loss of bodily function not otherwise provided for" within the last quoted section above? We think the record justifies the conclusion that there is more loss of function than the mere loss of a thumb, but that it does not justify the conclusion of a loss not otherwise provided for in the section. The statute provides 30 weeks compensation for loss of a thumb at the proximal joint, and 60 weeks for loss of thumb and metacarpal bone. Under the testimony of the doctors, and which any one can know by the simple manipulation of his own hand, the loss of function could not be more and would probably be less, than in case of loss of thumb and metacarpal bone, which has a maximum compensation period of 60 weeks. Assuming that the loss of function in the metacarpal bone was equal to the loss thereof, the maximum loss of use under the act, it would only allow for 60 weeks of compensation, such total loss being provided for in the statute.

We have held that where an injury consists of the loss of a member named in section 42-1-62, supra, the amount therein specified is controlling and cannot ■ be enlarged or diminished by the commission.

In *Aetna Life Insurance Co.* v. *Industrial Commission,* 64 Utah 230, at page 236, 228 P. 1081, at page 1084, the court said:

"the injury resulted in the loss of a member of the body, the compensation must be fixed in accordance with the schedule, which provides a specific compensation for the loss of a particular member of

the body. That is, if, as in this case, the injury results in 'the loss of one leg at or so near the hip joint as to preclude the use of an artificial limb,' the payment of the weekly amount must continue for 180 weeks, and no more."

It is true that the court in that case did say that if other injuries occurred in addition to the specific one, the Commission might have some discretion. But this court continued:

"When the loss of the leg occurs, or the loss of function is complete, he would then receive the amount fixed by the statute for the loss of the leg."

This court said, referring to loss of members where there is a fixed and definite amount, in *Spring Canyon Coal Co.* v. *Industrial Commission,* 57 Utah 208, at page 212, 193 P. 821, at page 822:

"As to these amounts the commission has no discretion; when the loss of the member is ascertained the law specifically determines the compensation."

And further on, at page 213 of 57 Utah, at page 823 of 193 P., this court states:

"We are constrained to hold that the language last quoted is mandatory in both form and substance, that it definitely fixes the compensation to be paid for the loss of specific members of the body, and that the compensation thus fixed is exclusive of any other compensation for disability arising solely from the loss of the particular member in question."

In the case of *North Beck Mining Co.* v. *Industrial Commission,* 58 Utah 486, 200 P. 111, where the employee lost more than one finger, this court clearly shows that it is only when there is a loss of more than one finger that the decreased usability of the hand is a fair method of compensation.

We quote from the case of *Denver & R. G. W. R. Co.* v. *Industrial Commission,* 73 Utah 86, at page 91, 272 P. 239, at page 241, where this court says:

"The term 'other disfigurement' appearing in the statute does not seem to have any practical significance. There is unquestionably a disfigurement when the hand is entirely lost and when the Legislature allowed, for such injury, compensation for 150 weeks it must be assumed that it took into consideration disfigurement as well as loss of function."

Again in the *Vukelich* v. *Industrial Commission* case, 62 Utah 486, 220 P. 1073, 1075, this court said:

"By providing a different basis of compensation for particularly described injuries, those injuries are thereby excluded from general provisions which would otherwise include them."

These holdings are in accord with those of other states under similar statutes. *Sheldon* v. *Gopher Granite Co.*, 174 Minn. 551, 219 N. W. 867; *Lente* v. *Lucci*, 275 Pa. 217, 119 A. 132, 24 A. L. R. 1462; *State* v. *Industrial Commission*, 126 Ohio St. 34, 183 N. E. 871; *Southland Gasoline Co.* v. *Bowlin*, 152 Okl. 117, 3 P. 2d 663; *Colorado Fuel & Iron* v. *Industrial Commission*, 88 Colo. 573, 298 P. 955; *Ujevich* v. *Inspiration Consol. Copper Co.*, 42 Ariz. 276, 25 P. 2d 273. Had the commission followed the views laid down in *Denver & R. G. W. R. Co.* v. *Industrial Commission*, supra, it would not have misconceived and misapplied the law as it did in this case.

3.   We come now to the third point urged—that the commission erred in doubling the amount of the award.
It is not disputed that the Canning Company violated ▮
Section 14-6-5, Chapter 11, Laws of Utah 1933, which reads:

"No minor under eighteen years of age shall be employed, permitted, or suffered to work in, about, or in connection with any occupation, unless his employer has procured *before the employment of said minor* an employment certificate issued as hereinafter prescribed, except that such minors may be employed without such a certificate outside of school hours, in housework, agricultural work and in casual work usual to the home of the employer; provided, that such employment shall not be in connection with nor form a part of the business, trade, profession or occupation of the employer." (Italics supplied.)

The Canning Company, while admitting its technical violation of the statute, argues that such violation was due to the neglect, inefficiency, and unlawful act of the state unemployment office and the school superintendent who should have issued the employment certificate and maintained an office open for that purpose. It says that at the request of the unemployment division of the Industrial Commission, it employed the people that office sent to them, and earnestly sought to secure the certificates without requiring the employees to lose two days' work to secure them.

While there appears to be no defense or excuse for the conduct of the school superintendent in not being available as required by law to issue the certificates promptly, and while the Canning Company may have been wholly motivated by a desire to help the employees who need the work, and to cooperate fully with the unemployment division, it did, definitely, admittedly, and knowingly, permit and suffer a minor to work before the minor secured an employment certificate. This statute is enacted for the protection of minors, and when a minor, employed without a certificate, is injured the compensation of the minor is fixed by statute in as positive a way as the amount fixed for loss of a member of the body—the compensation shall be doubled. Section 14-6-27, Chapter 11, Laws of Utah 1933.

The award of the Industrial Commission is vacated and set aside.

MOFFAT, C. J., and McDONOUGH and PRATT, JJ., concur.

WOLFE, Justice (concurring).

I concur. The commission went into the question of applicant's probable ability to earn more wages with the plaintiff company, but none of the evidence adduced would support the conclusion that she could have made with that company, even after long experience, the sum of $26.60 per week—60 per cent of which would be $16. And there was

no evidence of what she upon gaining experience could make in the industry as a whole nor as to any other field of activity. As to whether it could be shown that she had capabilities by which she could reasonably be expected to have increased her earnings in other fields of human activity is not before us, because no attempt was made to base the $16 per week compensation on any such evidence.